May it please the court, counsel. My name is Tom Ploidal. I'm arguing on behalf of, or as a substitute for, my former partner, John Hanna, who handled this matter in the district court. He was appointed to the Superior Court of Maricopa County in Arizona and is no longer practicing. So I have substituted for him. You'll forgive me if I'm not as conversant with the record as he would have been. This is a case involving a bank robbery. I won't go into the facts, and I would like to reserve a few minutes, at least two minutes, for rebuttal. I won't go into the facts, but basically it's three bank robberies were charged, all having been committed in the East Valley area of Phoenix and Maricopa County, one in Gilbert, a suburb, one in Tempe, another suburb, and one in Chandler. These were September 20th of 2000, October 11th of 2000, and October 25th of 2000. Ms. jernigan was arrested on November 10th of 2000. The second, third, and fourth, if we're going to consider the fourth, 9-20-11. 10-11. And 10-25. 10-28, 10-30. Pardon me, 11-28, 11-30, and 12-11. Isn't that 12-11-2001? That's correct. Now, those are the ones that became known to the defendant subsequent to the defendant's trial. I'm sorry, I misunderstood. And that's where the issue that was presented before the district court in the motion for new trial was should the evidence have been disclosed of the two bank robberies which were then known prior to Ms. jernigan's trial, the one on November 28th of 2000, the one on November 30th of 2000. Tell me, counsel, exactly what evidence you think could have come in had they known about these two robberies that occurred subsequent to her robbery. Well, Your Honor, what the defendant would have presented at trial, the defendant presented an identity defense. Yes, that's the only thing there is, is identity in this case. There's nothing else. That's correct. But what the defendant was unable to do at trial was to point the finger, so to speak, at someone else who may have committed this robbery. The striking similarity in the physical descriptions, in the ethnicity, in the stature between the defendant who was eventually charged, Ms. Juanita Rodriguez Gallegos, was charged in the November 28th and the November 30th robbery. The striking similarities, the similarities in the way in which the robberies occurred with a note that said don't turn the alarm on. Mr. Boydell, you know, you've talked about these generalities, and it's all true, and your argument's a good argument. But the problem is when you look at the two people involved, they're different people, of course, and you had a witness that was robbed or she was present when both robberies occurred and said they were different people. And then you get the trial judge who looked at the or the district judge who looked at this matter. Yes, it was the trial judge. He was the trial judge. And he says, you know, these are different people. And, yes, you had notes, but the notes were, you know, a little different. Well, that's correct, Your Honor. And, obviously, in the briefs, there's some disagreement concerning whether the judge should have just made a determination of whether these were there were sufficient similarity to grant relief. The tendency in eyewitness identification, however, is always to try to identify somebody who most closely resembles the person that you saw and to try to make that identification. Mr. Chalupas, was that her name? Chalupas. Chalupas. You know, she had looked at this lady for quite a while. Well. You know, the lady passes the note to her and she says, can I help you? And then asks her again when the lady doesn't respond, can I help you? And then she looks at her in the face and looks down at the note and all of that. You know, that's quite a bit. Then counts out her, gives her all the money, and then she leaves. That's a reasonable time to look at her. And then identifies a photo and the next day. No, two days later. Two days later, she identifies Ms. Jernigan from a photo spread. That's correct. Of course, she was never given an opportunity to review anything that had Ms. Rodriguez-Gallegos in it. The other. That particular, the victim teller. The other teller, the one who the government has cited, was someone who didn't have as much. Ms. Gallaher, I believe her name is. She saw a profile. That's correct. She didn't have quite as good a view of it. And that's the person that the government has come forward with who has made a statement that the. Different people. They were different people because that teller was also present on the December 11th robbery and then says that they were different people. That's pretty tough evidence unless you can show some similarity in the two robberies that Judge Letcher was getting to. I understand, Your Honor. The similarity here, I mean, you have to look at the fact that women committing bank robberies, that's a fairly rare circumstance in and of itself. 5 percent, about 5 percent, 6 percent, something around there, of bank robberies are, the perpetrators are identified as women. So that's something fairly unique in and of itself. The robbery on November 28th, I believe, the 28th robbery occurs across the street from the robbery in Gilbert, Arizona, occurs across the street from the robbery that occurred on September 20th. So there are many, many similarities. The stature of the person. Wasn't the same bank robbed later on? The same bank was robbed December 11th of 2001. That was the same bank that Ms. Jernigan was convicted of robbing on September 20th of 2000. Counsel, let me ask you this. Judge Carroll made a statement that the two videotapes showed them to be different people. Now, we don't have the benefit of those videotapes. Were they both compared side by side? Was either one of them enhanced? It seems to me that that was the case. My recollection is that there was an attempted enhancement of one of the videos. I think the first one. The first one. That's my recollection. But perhaps the prosecutor who handled the trial would know that. I don't know what efforts were made other than I think there was one possible enhancement. And I don't know whether they were compared side by side. I didn't know exactly what the district court was looking at when he made that. But the point of our argument is it should be for the jury. All we have to show is something that would undermine confidence in the outcome because of the nondisclosure of the two bank robberies. And it should be for the jury to decide whether Ms. Jernigan was the one who committed those robberies. And part of that evidence would be that a defense lawyer for Ms. Jernigan would put forward would be the fact that these two other robberies by very, very similar persons had occurred shortly afterwards in close proximity to the robbery that she was convicted of. I understand all that. But I really would be very interested if there was a true capacity to compare those two videos and whether they were both enhanced and whether it was done. Well, all I know is that one, I think, was enhanced. And I don't know about whether the other one was enhanced. And as far as I know, I don't think they were compared together. But as I say, I was not present for the trial court procedure. I would like to ask you a question about the FBI. The investigator, Richard, thought I think he handled the 1128 and 1130. He handled all of these. He handled all of them. So he was the person who had seen both the September and November ones, right? Right. Well, that's correct. But what happened here, I'll reserve the rest of my time. But what happened, of course, was the FBI had concluded that the first three bank robberies were done by the same person. They arrested Ms. Jernigan. They had their person. Unfortunately, the bank robberies continued to happen in the vicinity of Gilbert Chandler Tempe, Arizona. And the FBI obviously couldn't conclude that Ms. Jernigan was involved in those, so they had to develop another suspect and conclude those were committed by somebody else. I'll reserve the remainder of my time. Good morning. Mike Morrissey for the government. Judge Fletcher, actually this court entered an order permitting both parties to send the original exhibits to this court. So you have the original videotape of the interview of Rodriguez. That's trial exhibit, motion for new trial exhibit 14, okay? You have her videotape, which you can play in any VCR. You also have the videotape of the robbery for which Jernigan was convicted. You have the originals of the government's trial exhibits as well. You have absolutely everything the district court had. A crude way that I'm not going to advocate, but a crude way to decide this case, is for this court to play the Rodriguez interview, which, again, is motion for new trial exhibit 14. Rodriguez interview? Yes. She was interviewed on December 11, 2001, when she got caught red-handed and invoked. But it's about a two- or three-minute interview, and you can see her on the tape. If you would look at that, and then you would go to the government's motion for new trial exhibits 8, 9, and 15, you can exactly see for yourself how different these women are. And let me also point out that the defense in its brief says that the judge abused his discretion by opining that these were two different women. And the response to that, for one thing, is in the Perkins case. Because in footnote 1 of the Perkins case, this Court talks about the judge did not abuse his discretion in excluding photos of a third person, another bank robber, when the Court concluded that person did not resemble the person in the robbery that was being trialed. So the Court did not behave badly or incorrectly by making that comparison. I would also note that in doing so, the Court was reacting to defense counsel's statement that these two women don't look alike. That was kind of an odd statement, but I think that's good that we do have those. I was not aware of them. They may be kicking around the Court, and we'll find them. They're here. They were sent approximately a month ago by both sides. And so the government's quite confident that if you make that comparison, you'll see what's going on here. The district court's reaction to the defense, and by the way, Mr. Hanna was not trial counsel either. I was. I was trial counsel. I was first appeal, and I'm counsel now. Robert McWhorter, yet another counsel, was actual trial counsel. But let me point out that at defendant's trial, which is the proper focus here in March 2001, for using a gun to commit a bank robbery, all that could have been disclosed to her was that two other banks, one close by, literally across the street, and one 10 miles away, which is not close, had been robbed by females not using a gun. No name for the unknown robber was available, and as we know, that robber wouldn't be caught until December 2001. As of March 2001, the unknown robber had not used a gun and had always spoken. Jernigan spoke one out of three times, and she did not speak in the robbery for which she was convicted. So the concept that there was similar modus operandi is incorrect. Well, what about the note? At which of the robberies was the note handed over which had kind of similar language? Well, I think at both. But Jernigan's note is never recovered because she's not arrested until approximately two months later. And interestingly, even in the Rodriguez robbery of December 2001, the note does not appear to have been recovered, despite the fact that the bait money was. So we don't really have an ability. Well, we can't compare the notes, apparently, but we do know from the tellers that they each used notes. Yes. But nothing could be more common, obviously, in a bank robbery than a bank robbery note. Counsel, isn't there a significant difference between the content of the notes in the Jernigan robbery and the other two in that the Jernigan robbery, the teller said she told us not to put any dye packs or trail or tracing material, and in the other two, that is never mentioned? That's true. And she's finally caught. Right. By a tracking device. That's for Rodriguez. Exactly. Klupza, the victim teller for the Jernigan robbery, was too scared to give up bait money. And also that note, consistent with the evidence, made specific reference to Klupza being shot. Okay? Rodriguez, or the unknown robber, isn't using weapons for the first two. She doesn't need to make that reference. Let me also state that the concept that this trial could somehow have been different in any way is flawed, because the theory, the defense's entire theory was that there was another female bank robber. So the jury had that concept to consider. But they didn't know. It would have been much more important to the jury if they knew that these other robberies had taken place and that it was someone who was under 5 feet tall and weighed about 130 pounds and was Hispanic and had acne. I mean, that could have been kind of critical to the jury. No. I respectfully disagree, because let me just talk about the acne point. Okay? There is one teller who refers to Rodriguez as having acne or pockmarks. Every other teller who dealt with Rodriguez said she was actually kind of attractive, including Gallaher, the percipient witness. So I would love to say, no, no, no. Jernigan always described as unattractive and pockmarked and acne, and Rodriguez always described as attractive. I cannot do that, because there is one teller who said that one thing about Rodriguez. But other than that, it was pretty clear, and that's why I've asked the Court to actually pull these tapes and review them. Other than that, it was pretty clear that these were two different women. Daniel. Was there any foundational testimony that Rodriguez-Gallegos was in Arizona? Absolutely not. And, in fact, I believe she's a naturalized American citizen. In contrast with this Court's Crosby case, where the Court found, wait a minute, the husband, who was not on trial for assault. Had opportunity. Opportunity. A prior conviction was within a 5-mile radius and clearly could have done it. Contrast that with this case. They can't even put her in the country, and her first robbery is 69 days later after Jernigan's robbery. Well, we're not sure about that. There's at least some suggestion that one of the robberies that Jernigan was initially indicted for might have been a Rodriguez robbery because of the identity of the getaway car. Well, that's a perfect example of where things have almost gone wrong in this case. And one of you all mentioned generalities. And let me respond directly to, quote, what about the black SUV. Okay? All right. Jernigan, in one of her robberies, which is October 11th, and this is at ER 515. You're saying it was her robbery, alleged to be her robbery. I'm the one who dismissed it, so yes. But let me get to specifically why it was dismissed. Jernigan was facing a 27-year guideline sentence, got a downward departure to 14 years. Fourteen years was enough from the government's view. So the one that she was charged for, October 11th, somebody sees a black Toyota. Okay. In contrast, November 30th, one of the clearly Rodriguez robberies, it is a dark-colored Toyota with gold trim. Okay. I've got a green Camry that my younger kids swear is black. Okay? Black and dark-colored. They don't say. Those are two different things. They don't say whether it's blue. They don't say whether it's dark green. They don't say whether it's black. And you have gold trim in one and not gold trim in the other. So even that doesn't totally line up. And even that would be for robberies that she was never convicted for. And the focus here is whether the government committed a Brady violation for the crime of conviction. And that evidence, it's just there's no possibility that this would have changed either the outcome of the trial to result in a probable acquittal or that it would even have come in under a Brady standard as somehow having been material. And the district court was in a very strong position, and especially under Crosby, to make that determination. What I'd ask of opposing counsel, and I ask you directly, exactly what could have come in at the trial? Nothing. Because they had no, unlike Armstrong, they had no bait money that they could trace back. The only thing they could have even asked to do is, can we wave around this picture of a robbery across the street? Okay? And Perkins, the district court says, I wouldn't have let that in. And Perkins says, it would not have been an abuse of discretion, footnote one, not to let that in. And so they got exactly the trial they would have had. They held up a picture of the woman the jury found to be Jernigan. And they said, this is a picture of a bank robber, but it's not Jernigan. They got exactly to blame it on someone else. And they couldn't have put a name to it at the trial because she was still the unknown robber at that time. So there is no evidence of any third-party culpability by Rodriguez. We'd have a completely different situation if they had an affidavit. I'm running out of time. I would also note Rodriguez cleared three robberies, and she didn't clear this one, and Gallaher was at both events. Let me just briefly address a couple of issues. Your Honor asked about the evidence that there wasn't any evidence that Rodriguez was in the Phoenix area at the time of the robberies that were attributed to Jernigan. There was no evidence Jernigan was there either, other than the eyewitness identification that was done after the robbery. As Your Honor may know, may recall, this her coming up as an investigative lead happened rather soon.   So the defense had the opportunity to find out whether the robber was in the area or not. I mean, could Crosby require there be proof of opportunity as well as motive? That somebody be in the area. Crosby said that the – but that was because it was a remote area. But you didn't even have foundational testimony that she had the opportunity to stick up the bank. Well, she – arguably she was there in November. The defense never had an opportunity – had the defense had an opportunity to know about those other bank robberies, obviously some further investigation could have been done. And what my point is that the way – the journey – You have that now. Do you have – was there any evidence in the motion for a new trial that Rodriguez-Gallegos was in Phoenix in September? Not that I know of, no. No. There was no evidence. But, again, there was no evidence that Ms. Jernigan was there either. And, in fact, there was – the trial may have been very, very different because Ms. Jernigan, of course, had asked to have a polygraph examination that she had passed, admitted in the trial. That really might have been different had there been more evidence to suggest somebody else was involved in these particular robberies. Thank you very much. Let me ask you one question. Have you seen the videos? I just looked at the still pictures, Your Honor. I have not looked at the videos. Okay. Excuse me, Your Honor. I need to tell the Court that if you decide to play the Jernigan bank robbery video, you will need a time-lapse VCR. You have Jernigan's stills. That needs a time-lapse VCR, which the government can send if the Court requires, whereas the Rodriguez interview will claim a regular VCR. Thank you very much. This matter will stand submitted. Thank you, gentlemen, for your time. May I make just a comment? Mr. Hoytel and Mr. Morsi, you have good arguments in your case. And I thought Mr. Hanna's brief was very good and his motion was excellent, and he's obviously going to be a very fine judge. So his quality came through, as did yours, sir. I'll convey that to him, Your Honor. Thank you.
judges: B. Fletcher, Thompson, Bea